**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:23-CV-00559-CHL**

**CYNTHIA W.,[1]**                                                                                          **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                                                **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Complaint filed by Plaintiff, Cynthia W. ("Claimant"). Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). (DN 1.) Claimant and the Commissioner each filed a Fact and Law Summary and/or supporting brief, and Claimant filed a reply. (DNs 14, 15, 17, 18.) The Parties have consented to the jurisdiction of a Magistrate Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed. (DN 10.) Therefore, this matter is ripe for review.

For the reasons set forth below, the final decision of the Commissioner is **REVERSED**, and this matter is **REMANDED**, pursuant to sentence four of 42 § U.S.C. 405(g), to the Commissioner to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

**I.    BACKGROUND**

On June 8, 2021, Claimant applied for disability insurance benefits under Title II ("DIB"). (R. at 18, 69-70, 77-78, 183-87.) Her applications alleged disability beginning on April 20, 2020, due to migraines, vertigo, back and hip pain, right hand tremors, and overactive bladder. (*Id.* at

---

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.

18, 70, 78.) Claimant's application was denied initially and again on reconsideration. (*Id*. at 90-94, 96-100.)

At Claimant's request, Administrative Law Judge ("ALJ") William C. Zuber ("the ALJ") conducted a hearing on Claimant's application on September 29, 2022. (*Id*. at 35-68, 101-02.) Claimant attended the hearing with her non-attorney representative. (*Id.* at 37, 86-89.) The hearing was held telephonically with Claimant's consent due to the COVID 19 pandemic. (*Id.* at 18, 145-47, 164-66.) An impartial vocational expert also participated in the hearing. (*Id.* at 37.)

During the hearing, Claimant testified to the following. Her bladder sling surgery did help, but she still has to wear pads and goes to the bathroom frequently at night. (*Id.* at 44.) She testified that her incontinence is now manageable. (*Id.* at 44-45.) As to her back, her provider told her he didn't want to proceed with surgery to put a rod in her back at this point so she still deals with back pain and goes to pain management for it. (*Id.* at 46-47.) She gets shots in her feet for her plantar fasciitis that do relieve some of the pain, and she also wears inserts in her shoes. (*Id.* at 47-48.) The combination of the inserts and shots give her some relief but not enough, and pain management told her there was nothing more they could do for her with regard to her feet. (*Id.* at 48.) She was being treated by two neurologists for her migraines but both left practice, and she couldn't get in to see a new doctor until the October after the hearing. (*Id.* at 49-50.) She takes a combination of Topamax, Maxalt, and Zomig for her migraines. (*Id.* at 50.) The Topamax has reduced the frequency of her headaches "a little bit." (*Id.*) However, she is still having migraines two to three times a month that last "two to three days, if not more." (*Id.* at 51.) Her migraines cause nausea, vomiting, dizziness, and vertigo that is bad. (*Id.* at 52.) When she has one, she gets in bed with "a cold pack on [her] head and just pray[s] for the pain to stop hurting." (*Id.*) She has had migraines since childhood, but they started getting really bad in 2015. (*Id.*) While she did

2

have migraines while employed, her employer would give her time off and there were times she "went into work with [her] head hurting." (*Id.* at 54; *see also id.* at 55 ("A lotta times I would work through it.").) She testified that her "anxiety is out the roof right now," and she is having family issues on top of her physical health issues. (*Id.* at 56-57.) She does not go around people too much anymore and is pretty much "homebound." (*Id.* at 57.) She has terrible mood swings and gets frustrated and overwhelmed easily. (*Id.*) In an average week, she probably has three to four bad days. (*Id.* at 59-60.) She is raising her two grandchildren, who have their own health issues. (*Id.* at 58-59.) Her husband and sister help her with day-to-day tasks like taking care of the kids, housework, and other things she can't do. (*Id.* at 60.) She uses a shower chair and a cane for walking. (*Id.*) She has swelling in her ankles and feet and elevates her legs a couple of times during the day. (*Id.* at 61.) She estimates that she can only sit for fifteen minutes at a time before she has to get up and move around, walk or stand for thirty minutes at a time before she has to sit down, and lift twenty-five pounds. (*Id.* at 61-62.)

The ALJ issued an unfavorable decision on December 8, 2022. (*Id.* at 15-34.) Applying the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled, the ALJ made the following findings. First, the Claimant has not engaged in substantial gainful activity since April 20, 2020, her alleged onset date. (*Id.* at 21.) Second, Claimant has the following severe impairments: degenerative disc disease, degenerative joint disease, migraine headache disorder, and plantar fasciitis. (*Id.*) Third, Claimant does not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.* at 23.) Fourth, Claimant has the residual functional capacity ("RFC") to perform light work with the following exceptions:

> the claimant [is] frequently able to climb ramps/stairs; she is occasionally able to stoop, crouch, crawl, or kneel. The claimant is unable to climb

3

>ladders/ropes/scaffolds. She is capable of frequent exposure to extreme cold, humidity, and vibration, and of no exposure to dangerous machinery/unprotected heights. The claimant is occasionally able to operate foot controls with her right lower extremity.

(*Id.* at 24.)  Additionally at step four, the ALJ found that Claimant was able to perform her past relevant work as an assistant financial manager as that work did not require the performance of work-related activities precluded by her RFC. (*Id.* at 28.) The ALJ concluded that Claimant was not under a disability from April 20, 2020, through the date of his decision.  (*Id.* at 29.)

Claimant subsequently requested an appeal to the Appeals Council, which denied her request for review on September 22, 2023.  (*Id.* at 1-7, 180-82, 327-29.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2024); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Accordingly, Claimant timely filed this action on October 26, 2023.  (DN 1.)

## II.    DISCUSSION

The Social Security Act authorizes payments of DIB to persons with disabilities.  *See* 42 U.S.C. §§ 401-434.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2024).

### A.    Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

B.    **Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. § 404.1520 (2024). In summary, the evaluation process proceeds as follows:

(1)    Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2)    Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3)    Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509 (2024).

5

>   (4) Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.
>
>   (5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.  Claimant's Contentions

Claimant challenged the ALJ's numerical findings nos. 4-6 regarding whether Claimant's impairments met any of the Listings, her RFC, and the ALJ's finding that she could perform her past relevant work. (DNs 14, 15, 18.) She argued that the ALJ erred at step three by not finding that her severe migraine headache disorder met or equaled the severity of Listing 11.02B pursuant to SSR 19-4p. (DN 14, at PageID # 1529-31; DN 15, at PageID # 1541-47; DN 18, at PageID # 1569-72.) She also argued that the ALJ's RFC determination was not supported by substantial evidence because it "failed to account for any limitations regarding the [Claimant]'s severe migraines or its effects upon the [Claimant]'s ability to function in the workplace." (DN 14, at PageID # 1531, 1531-32; DN 15, at PageID # 1547-49; DN 18, at PageID # 1572-73.) Finally, she argued that the ALJ's hypothetical to vocational expert "wrongly exclude[d] limitations related to [Claimant]'s severe migraine headache disorder." (DN 14, at PageID # 1532; DN 15, at PageID

6

# 1549.) Because the Court concludes the ALJ erred at step three, the Court does not specifically reach Claimant's other arguments, which are largely derivative of her argument about the ALJ's step three analysis.

Claimant argued that the ALJ's step three analysis was insufficient because he did not explicitly address Listing 11.02B, and the record raises a substantial question as to whether her migraine headaches medically equal that Listing. (DN 15, at PageID # 1543-47.) At step three of the five-step evaluation process, the ALJ considers whether the claimant has an impairment that meets or equals the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, which are generally referred to as the "Listings." 20 C.F.R. § 404.1520(a)(4)(iii). A claimant's impairment "meets" a Listing only when the claimant manifests the specific requirements described in the Listing's medical criteria; in other words, a claimant must point to specific findings that duplicate the enumerated criteria of the listed impairment. 20 C.F.R. § 404.1525(d) (2024); *see also Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006); *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."). However, a claimant can also be considered disabled if his or her impairment is the "medical equivalent" of a Listing, meaning that the claimant's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a) (2024). The relevant regulation specifies that "medical equivalence" can be found in three ways: (1) a claimant has a listed impairment, does not exhibit all of the findings or the requisite level of severity in the relevant findings, but the other impairment-related findings are "at least of equal medical significance to the required criteria"; (2) a claimant has a non-listed

impairment that is of "at least equal medical significance" to a listed impairment; or (3) the claimant has multiple impairments that in totality are of "at least of equal medical significance" to a listed impairment. *Id.* at § 404.1526(b). If a claimant demonstrates that his or her impairment "meets" or "medically equals" a Listing, he or she is deemed conclusively disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d).

While an ALJ is not required to address every Listing in his or her findings, if "the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014). A "substantial question" requires the claimant to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. But the regulations do not specify how much discussion an ALJ must provide regarding those Listings as to which a substantial question is raised. The Sixth Circuit has held that in evaluating whether a claimant has met or equaled a particular Listing, an ALJ must "actually evaluate the evidence, compare it to . . . the [relevant] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). But the Court does not construe this as a heightened articulation requirement because, as the Sixth Circuit has also held, the applicable regulations only require the ALJ to *consider* whether the Listings are applicable; they do not require the ALJ to provide "good reasons" as in the context of the former treating physician rule. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(3), (a)(4)(iii) and *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), *as amended*); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir.

2006). Nor do the applicable regulations regarding the Listings require an ALJ to explain how he or she considered particular factors as they do in the context of the rules applicable to opinion evidence. *See* 20 C.F.R. § 404.1520c(b)(2) (2024) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision."). While some unpublished Sixth Circuit cases have found that a court may properly look to the ALJ's analysis elsewhere in the decision to assess what the ALJ considered at step three, others discourage speculating as to the ALJ's analysis. *Compare Bledsoe*, 165 F. App'x at 411 ("The mere failure to discuss every single impairment under the step three analysis is not a procedural error."), *and Forrest*, 591 F. App'x at 366 ("[T]he ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."), *and Smith-Johnson*, 579 F. App'x at 435 ("It also is proper to consider the ALJ's evaluation . . . at other steps of his decision . . . ."), *and Neace v. Comm'r of Soc. Sec.*, No. 22-5090, 2022 WL 20742559, at *4 (6th Cir. Sept. 14, 2022) (noting that "[t]he ALJ did not explain their [step three] reasoning elsewhere in the decision"), *with Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *6 (6th Cir. Mar. 6, 2017) (noting that while the district court looked elsewhere in the ALJ's opinion to see what medical evidence the ALJ had cited, "[t]he district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02"). These cases notwithstanding, SSR 17-2p specifically addresses articulation requirements for an ALJ's discussion of medical equivalence. SSR 17-2p, 82 Fed. Reg. 15263 (Mar. 27, 2017). As to cases where no medical equivalence is found, the SSR provides,

> Similarly, an adjudicator at the hearings or AC level must consider all evidence in making a finding that an individual's impairment(s) does not medically equal a listing. If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the

9

> individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

*Id.* at 15265. Considered together, all of the above authorities require the ALJ's decision, read as a whole, to somewhere "provide a sufficient explanation for a court to determine the basis for [an] unfavorable finding about medical equivalence" like the ALJ made here. *Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *9 (W.D. Ky. Feb. 9, 2021).

Claimant argued that the ALJ gave no such sufficient explanation for why her migraines were not medically equivalent to Listing 11.02B.[3] Here, at step two, the ALJ found that Claimant's migraine headache disorder was a medically determinable impairment that "significantly limit[ed] the ability to perform basic work activities." (R. at 21.) At step three, the ALJ stated,

> The claimant's headaches were evaluated pursuant to SSR 19-4p. The National Institute of Neurological Disorders and Stroke (NINDS), the American Academy of Neurology, and other professional organizations classify headaches as either primary or secondary headaches. Examples of primary headache disorders include migraine headaches, tension-type headaches, and cluster headaches. Primary headaches occur independently and are not caused by another medical condition. Secondary headaches are symptoms of another medical condition such as fever, infection, high blood pressure, stroke, or tumors. We establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an acceptable medical source. We will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as medically determinable impairments because secondary headaches are symptoms of another underlying medical condition. We

---

[3] While Claimant also characterized the ALJ's lack of citation to Listing 11.02B in his step three analysis as an error in and of itself, the Court views any such error to be the equivalent of a typographical one here. While the ALJ did not cite Listing 11.02B in his analysis, he did cite SSR 19-4p saying that he considered Claimant's headaches in accordance with that ruling. (R. at 23.) As set forth in more detail *infra*, SSR 19-4p requires the ALJ to consider at step three whether a claimant's primary headache disorder is medically equivalent to Listing 11.02B or D. SSR 19-4p, 84 Fed. Reg. 44667, 44670-71 (Aug. 26, 2019). Thus, the ALJ's citation to SSR 19-4p was the equivalent of a citation to 11.02B and D such that the mere absence of a more specific citation was not an independent error by the ALJ.

10

> evaluate the underlying medical condition as the medically determinable impairment. Generally, successful treatment of the underlying condition will alleviate the secondary headaches. We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration, and is considered in assessing the residual functional capacity. In May of 2021, a computed tomography (CT) scan of the claimant's head was negative for acute intracranial findings (see page 12 of Exhibit 9F). In February of 2022, a medical report from Norton Neuroscience Institute reflected the claimant received good benefit from her migraine medication, Topamax (see page 10 of Exhibit 11F). The claimant did not exhibit any tremors, and she had normal attention and concentration, normal speech, alertness, good knowledge, normal comprehension, and an ability to follow three-step commands (e.g., see page 11 of Exhibit 11F).

(*Id.* at 23 (citing *id.* at 627, 652-53).) The first portion of the ALJ's analysis is largely quoted from SSR 19-4p—the ruling he referenced at the beginning of his analysis—but from sections of the SSR related to what a primary headache disorder is, how one will be established as a medically determinable impairment, and how a primary headache disorder is considered in assessing RFC. SSR 19-4p, 84 Fed. Reg. at 44668-70. The ALJ did not quote or reference any material from the section of the SSR related to "evalua[ting] a[] [medically determinable impairment] of a primary headache disorder under the Listing of Impairments," which would have been more relevant to his step three analysis. *Id.* at 44670-71. As to the records he cited, the ALJ did not note that the CT scan had been ordered due to the blurred vision, migraines, and vertigo Claimant was experience. (R. at 627.) Likewise, he did not note that during Claimant's February 3, 2022, visit with the Norton Neuroscience Institute, though the purpose of her visit was to follow up regarding her migraines, the records from her visit do not indicate that she was actively having a migraine when she presented in the office. (*Id.* at 652-53.) The normal findings cited by the ALJ appear to be of dubious relevance to Claimant's condition, symptoms, and abilities during an active migraine event.

11

At step four, the ALJ included no limitations in his RFC related to Claimant's migraines. (*Id.* at 24.) In support, he noted Claimant's testimony that she suffers from "migraine headaches with nausea" as well as "severe vertigo" that occur two to three times per month and last two to three days or more. (*Id.*) The ALJ summarized the Claimant acknowledged "experienc[ing] some reduction in migraines with medication (Topomax)." (*Id.*) The ALJ found Claimant's testimony "inconsistent because the medical evidence established the claimant was able to function even with [her] impairments." (*Id.* at 25.) The ALJ noted that in April and November 2021 while seeking treatment at Baptist Health, Claimant's "musculoskeletal, neurological, and psychiatric systems were negative for symptoms." (*Id.* (citing *id.* at 1097, 1125-26).) The ALJ summarized that during treatment with her pain management provider between May 2021 and March 2022, Claimant demonstrated on evaluation "normal extremity movements, . . . a healthy appearance, good personal hygiene, good judgment and insight, a normal mood and affect, and alertness" and that Claimant "denied having difficulty with concentrating, remembering, making decisions, dressing, bathing, walking, or running errands, and denied having gait dysfunction, frequent headaches, tremors, mood swings, memory loss, sleep disturbances, or hallucinations." (*Id.* at 26 (citing *id.* at 477, 479-80, 485, 492, 494, 500, 506-08, 523, 572, 580, 583, 585, 589-92).) The ALJ cited the same record from his step three analysis noting that Claimant reported good benefit from Topomax in February 2022 as well as "did not exhibit any tremors, and she had normal attention and concentration, normal speech, alertness, good knowledge, normal comprehension, normal behavior, and an ability to follow three-step commands" during the same visit. (*Id.* at 26 (citing *id.* at 652-54).) He also noted that in March 2022, she again demonstrated additional normal objective findings such as "a healthy appearance with no significant distress, . . . intact memory, normal attention and concentration, intact language skills, and an intact knowledge base." (*Id.* at

26 (citing *id.* at 675-76).) The ALJ emphasized that Claimant received unemployment benefits for a period between 2020 and 2021 indicating she was "willing, able, and available for work" and "seeking employment." (*Id.* at 28.) He concluded that Claimant's "exams showed the [C]laimant was essentially able to function mentally and physically." (*Id.*) But the ALJ included no specific discussion of what effect Claimant's continued migraines would have on her ability to work, nor do the findings summarized herein equate to a rejection by the ALJ that Claimant experienced any migraines at all. Much as with the records cited in the ALJ's step three discussion above, there was again no discussion or indication that Claimant was experiencing a migraine during any of the visits cited by the ALJ for "good" objective findings.

On balance, the Court finds that the ALJ's discussion is insufficient to support with substantial evidence the ALJ's conclusion that Claimant's migraine headache disorder did not medically equal Listing 11.02B pursuant to SSR 19-4p. SSR 19-4p addresses how primary headache disorders will be considered in DIB claims. SSR 19-4p, 84 Fed. Reg. at 44667. In particular, SSR 19-4p provides that while headache disorder is not a listed impairment, it can be the medical equivalent of one. *Id.* at 44670-71. It notes that Listing 11.02 for epilepsy "is the most closely analogous listed impairment for a[] [medically determinable impairment] of a primary headache disorder." *Id.* at 44671. While there are four ways to demonstrate epilepsy under Listing 11.02,[4] SSR 19-4p explains how to consider medical equivalence to two of the four ways to meet the Listing for epilepsy, both of which relate to dyscognitive seizures as specified in

---

[4] Listing 11.02 provides that a claimant can meet the Listing for epilepsy if the claimant demonstrates that despite adherence to prescribed treatment, the claimant has (A) generalized tonic-clonic seizures at least once a month for three consecutive months; (B) dyscognitive seizures at least once a week for three consecutive months; (C) generalized tonic-clonic seizures at least once every two months for four months and a marked limitation in one of five specified areas of functioning; or (D) dyscognitive seizures occurring once every two weeks for three consecutive months and a marked limitation in one of five specified areas of functioning. Listing 11.02, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective Apr. 2, 2021, through Oct. 5, 2023). The five areas of functioning are physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.*

Listing 11.02 paragraphs B and D.  Claimant's arguments in the instant case are related to paragraph B.  (DN 15, at PageID # 1543-47.)  SSR 19-4p explains of Listing 11.02B:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 84 Fed. Reg. at 44671.

Claimant argued that she satisfied "all equivalency requirements of Listing 11.02B" and that the ALJ's step three discussion cited above utilized "an incorrect legal standard because none of the facts referenced by the ALJ [we]re necessary to medically equal Listing 11.02B." (DN 15, at PageID # 1543-44.)  The Court agrees.  In her brief, Claimant pointed to a number of records that raise a substantial question about whether Claimant's migraines are medically equivalent to Listing 11.02B.  First, while Claimant's migraines are not themselves dyscognitive seizures, she pointed to records substantiating that her migraines cause symptoms that are the medical equivalent of the "alteration of consciousness" involved in a dyscognitive seizure.  *See* Listing 11.02H1b, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective Apr. 2, 2021, through Oct. 5, 2023).  The records she cited documented that she experiences migraines with aura that often involve or are proceeded by vertigo, nausea, vision issues, tinnitus, and photophobia.  (R. at 52, 389-91, 1180-84, 1292-1303, 1340-43.)  These conditions, combined with her pain, are sufficient to raise a question about alteration of consciousness that the ALJ's decision does not address.  Second,

14

Claimant cited records regarding the frequency of her seizures that meet the once a week for three month requirement of the Listing.  Her medical records document that in October 2021, she was complaining of four to six migraines per month and in February of 2022, she was complaining of one to two migraines per week.  (*Id.* at 652, 1292.)  While as the ALJ noted, she did receive good benefit from one of her migraine medications, there is no indication that the medication fully eliminated her migraines.  And the ALJ's only reference to the frequency of her migraines was a citation to her testimony during the September 29, 2022, hearing that she has two to three migraines per month.  (*Id.* at 24.)  But the ALJ does not reference the prior records regarding frequency at all.  The records seems to suggest that at least for a time, she had headaches at the required frequency.  Third, Claimant cited records establishing—and even the ALJ's decision seems to support—that she took her medication as prescribed.  Neither the Commissioner nor the ALJ cited any records regarding Claimant being noncompliant with her prescribed medications.  She testified during the hearing that she takes three such medications.  (*Id.* at 50.)  Records from Norton Neuroscience confirm that she was prescribed and took her medications as directed.  (*Id.* at 652, 654, 1303, 1343.)  None of this evidence is addressed by the ALJ in his decision.  Instead, he cites to a number of normal objective findings from visits when she was not being treated for a migraine that do not support anything about her condition when she does have one, how many she has, or any of the required criteria for Claimant's migraines to medically equal Listing 11.02B.

      The Commissioner argued that Claimant hadn't raised a substantial question about whether her migraines medically equaled Listing 11.02B because she hadn't pointed to a statement from an acceptable medical source with a detailed description of her migraine as required by SSR 19-4p.  (DN 17, at PageID # 1564.)  But the record contains multiple places where providers gave a detailed description of Claimant's migraines, including during her neurology visits and during at

15

least one visit to the emergency room she made due to a migraine. (R. at 390, 1180, 1299, 1340.) Though the descriptions are based in part on Claimant's own description of her migraine events, there is no indication that disqualifies these provider notes from being the type of statement contemplated by SSR 19-4p, and the Commissioner cited none.

The Commissioner also argued that Claimant did not cite a "qualifying medical assessment or administrative finding" citing SSR 17-2p. (DN 17, at PageID # 1564.) But the Court finds that this does not excuse the ALJ's step three error. As noted above, SSR 17-2p addresses the rules regarding making findings of medical equivalence, like the one Claimant is arguing should have been made here. SSR 17-2p, 82 Fed. Reg. at 15263. SSR 17-2p states:

> To demonstrate the required support of a finding that an individual is disabled based on medical equivalence at step 3, the record must contain one of the following:
> 1. A prior administrative medical finding from an [Federal or State agency medical consultant] or [Federal or State agency psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or
> 2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or
> 3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

*Id.* at 15265. SSR 17-2p states that, at the hearing level, the ALJ "may ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s)." *Id.* at 15264. Where an ALJ does not believe the evidence supports a medical equivalence finding, the ALJ is not "require[d] . . . to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.* at 15265. "Other courts have interpreted this ruling to place the responsibility of obtaining expert evidence on the ALJ, not the claimant." *Chelsea H. v. O'Malley*, No. 3:23-CV-00241-RSE, 2024 WL 3953991, at *6 (W.D. Ky. Aug. 27, 2024) (citing

16

*Morris v. Comm'r of Soc. Sec.*, No. 18-12702, 2019 WL 3943976 at *4 (E.D. Mich. Aug. 2, 2019), and *Freeman v. Kijakazi*, No. 8:22-cv-683-SPF, 2023 WL 2446621 at *5, (M.D. Fla. Mar. 10, 2023)). Like these other courts, this Court "refuses to penalize Claimant when the proper exercise of the ALJ's discretion favored additional medical evidence." *Id.* Accordingly, the Court rejects the Commissioner's arguments.

For all of these reasons, the Court finds that the ALJ's step three analysis is erroneous and not supported by substantial evidence. Because the Court has concluded the ALJ erred at step three, the Court does not reach the remainder of Claimant's arguments. However, the Court does express substantial skepticism about the adequacy of the ALJ's RFC analysis given that it failed to include a more thorough explanation of the ALJ's rejection of the severity of Claimant's migraines. In particular, as noted above, the Court is unclear how normal objective findings while Claimant is not experiencing a migraine support either that she does not experience them as frequently as she claimed or that she does not experience the symptoms she claimed when having one.

### III. CONCLUSION AND ORDER

For the reasons set forth above, the final decision of the Commissioner is **REVERSED** and that this matter is **REMANDED**, pursuant to sentence four of 42 § U.S.C. 405(g), to the Commissioner to conduct additional proceedings to remedy the above-identified defects in the original proceedings. A final judgment will be entered separately.

Colin H Lindsay, Magistrate Judge<br>
United States District Court

cc:   Counsel of Record
      March 11, 2025